UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| MALIAKA DAVIS, et al.,<br>    Plaintiffs, | Case No. 1:11-cv-533<br>Bertelsman, J.<br>Litkovitz, M.J. |
| vs. | |
| CINCINNATI METROPOLITAN<br>HOUSING AUTHORITY, INC., et al.,<br>    Defendants. | REPORT AND<br>RECOMMENDATION |

This matter is before the Court on plaintiffs' motion to enforce settlement agreement (Doc. 35), defendants' memorandum in opposition to the motion (Doc. 36), and plaintiffs' reply memorandum in support of the motion (Doc. 37).

**I. Introduction**

Plaintiffs brought this action in August 2011 against defendants Cincinnati Metropolitan Housing Authority, Inc. ("CMHA"), and CMHA's Interim Executive Director, Ted Bergh, alleging violations of plaintiffs' rights under the Uniform Relocation and Real Property Acquisition Policies Act ("Uniform Relocation Act") and Fair Housing Act ("FHA") and federal constitutional provisions. Plaintiffs alleged that defendants violated their federal rights by permanently displacing them from their longtime rental residences at 2329 Harrison Avenue in Cincinnati, Ohio, for purposes of renovating the residences, without first making available to plaintiffs comparable replacement housing and other relocation assistance and supportive services required by federal law. (Doc. 11, Amended Complaint). The Amended Complaint included specific allegations that CMHA informed plaintiff Carla Kinkade she must relocate to another CMHA property due to the renovations, and she would be denied the opportunity to

return to the Harrison Avenue property and would be evicted if she did not relocate to another CMHA property; her rent payments and security deposit were increased as a result of the relocation; and after initially accepting her rent payments, defendants rejected her rent payments and filed an eviction action for non-payment of rent, although the eviction action was eventually dismissed. (Amended Complaint, ¶¶ 74-78).

Following settlement negotiations among the parties, the Court was advised that the parties had reached a settlement agreement. Accordingly, on October 30, 2012, the Court entered an order dismissing the case with prejudice on the condition that any of the parties could move to reopen the action within 30 days if settlement was not consummated. (Doc. 34). The Order included the following statement: "The Court retains jurisdiction over the settlement agreement for the purposes of its enforcement." (*Id.*).

The parties subsequently reduced their agreement to writing. (Doc. 35, Plaintiffs' Exh. A - "Settlement Agreement and Release of All Claims") (hereafter, "Settlement Agreement"). Plaintiffs signed the Settlement Agreement on November 27 and 28, 2012, and Gregory Johnson, who had been named Executive Director of CMHA during the course of the litigation, signed the Settlement Agreement on December 4, 2012, as "CMHA Executive Director, on behalf of himself and the CMHA Board."[1] (*Id.*).

The Settlement Agreement provides under Part I that CMHA agreed to do the following:

> ¶ 1.1: Invite each plaintiff, with the exception of plaintiff Angela Brown, to return to 2329 Harrison Avenue when the appropriate units were ready for occupancy, which was anticipated to occur in or about January 2013;

---

[1] The amended complaint did not specify whether Interim Director Ted Bergh was sued in his official capacity or in his individual capacity. (Doc. 11). However, the Settlement Agreement demonstrates that plaintiffs intended to name Bergh in his official capacity only. Defendant Bergh did not sign the Settlement Agreement; rather, Johnson signed the Settlement Agreement solely in his capacity as CMHA Executive Director and on behalf of the CMHA Board. (Doc. 35, Plaintiffs' Exh. A, p. 4). Accordingly, Johnson was automatically substituted for Bergh as a defendant to this lawsuit as of the date Bergh ceased to hold the position of Interim Executive Director of CMHA. *See* Fed. R. Civ. P. 25(d).

2

¶ 1.2: Pay each plaintiff, with the exception of plaintiff Brown, the sum of $1,000.00; and

¶ 1.3: Pay plaintiff Brown the reduced sum of $544.00 ($1,000 less the sum of all remaining amounts she owed to CMHA, or $456.00), resulting from a pending eviction action against her; dismiss that cause of action; and include a confirmation of a $0 tenant balance and CMHA's agreement to provide a neutral reference going forward.

The Settlement Agreement included the following agreements by plaintiffs:

¶ 2.1: Plaintiffs agreed to voluntarily dismiss their claims and lawsuit with prejudice;

¶ 2.2: Plaintiff Brown agreed to dismiss her counterclaim in the eviction action with prejudice; and

¶ 2.3: Plaintiffs agreed to release CMHA from all responsibility for payment of moving expenses and utility reconnection associated with the return of any plaintiff to 2329 Harrison Avenue.

The Settlement Agreement also contained a release provision that reads as follows:

> Plaintiffs and Defendants agree to fully and finally release each other *from any and all legal and equitable claims arising out of the Lawsuit as well as up through the date of this Settlement Agreement.* Specifically, the Plaintiffs hereby forever release, acquit, hold harmless and discharge Defendants and Defendants' respective officials, board members, insurers, officers, attorneys, agents, representatives, employees, successors and assigns from all claims, demands, actions and causes of action, obligations, damages, costs or expenses, including attorneys' fees, known or unknown, contingent or otherwise, and whether specifically mentioned or not, that they now have or have had or which might be claimed to exist at or prior to the date of this Agreement. For their part, Defendants specifically hereby forever release, acquit, hold harmless and discharge Plaintiffs and Plaintiffs' heirs, successors and assigns, insurers, attorneys, agents, representatives, and employees from all claims, demands, actions and causes of action, obligations, damages, costs or expenses, including attorneys' fees, known or unknown, contingent or otherwise, and whether specifically mentioned or not, that they now have or have had or which might be claimed to exist at or prior to the date of this Agreement.

(*Id.*, ¶ 3.2) (emphasis added).

## II. Plaintiffs' motion to enforce the Settlement Agreement

Plaintiffs filed their motion to enforce the Settlement Agreement on May 7, 2013. (Doc. 35). Plaintiffs allege that CMHA has breached the Settlement Agreement by threatening to evict

3

plaintiff Carla Kinkade from CMHA housing over unpaid penalties and charges which she challenged in this lawsuit as violative of the Uniform Relocation Act and the FHA and which defendants released as part of the Settlement Agreement. Plaintiff Kinkade alleges that defendants have wrongfully assessed amounts owed by her based on claims for debts that arose during the parties' lawsuit. She specifically contends that while the parties' lawsuit was pending, she was twice wrongfully sued for eviction from CMHA housing, although those complaints were eventually dismissed by CMHA. (Doc. 35, Exhs. B-D). Plaintiff Kinkade alleges that during that time period, her rent was paid into a Client Trust Account and was forwarded periodically by her counsel to counsel for CMHA. Plaintiff Kinkade contends that all of her rent payments have been accepted by CMHA's counsel without challenge.

Plaintiff Kinkade further alleges that beginning in January 2013, CMHA refused her rent and issued her a rent statement claiming she still owed "thousands of dollars in charges and penalties which arose and accrued during the lawsuit." (Doc. 35 at 6). She asserts that by March 2013, her counsel intervened and sent the "rejected rent for January, February and March 2013" and a copy of the Settlement Agreement to counsel for CMHA and to CMHA's in-house counsel.[2] (*Id.*). Plaintiff Kinkade alleges that CMHA wrote to her counsel in April 2013 demanding that "the alleged carry over debt be paid" because the disputed items were neither addressed nor waived by the Settlement Agreement. (*Id.*, citing Doc. 35, Exh. E[3]).

Plaintiff Kinkade alleges that her rent payments are current but have been applied by CMHA to charges and penalties that should have been released by the Settlement Agreement, such that an outstanding balance remains on CMHA's books which CMHA now seeks to

---

[2] Plaintiff does not specifically allege whether CMHA accepted the rental amounts owed for January, February and March 2013 (post-Settlement Agreement) that were tendered by her counsel, but plaintiff does allege she is "current in her rent." (Doc. 35 at 1).
[3] The letter is also attached as Exhibit 2 to defendants' opposing memorandum (Doc. 36).

4

recover. Plaintiffs request that CMHA be ordered to specifically perform under the Settlement Agreement by "removing all of the charges, late fees and 'increases' that arose during the pendency of this lawsuit from the Rent Ledger of Plaintiff Carla Kinkade" and that the ledger be amended to reflect that plaintiff Kinkade "is, in fact, current in her rental obligations." (*Id*. at 9).

In response, defendants contend that during and following the pendency of the parties' lawsuit, plaintiff Kinkade has incurred obligations under a lease agreement with CMHA which were not released by the terms of the Settlement Agreement. Defendants assert that plaintiff Kinkade has been residing at 598 Claymore Terrace as a tenant of CMHA since July 1, 2011. (*See* Doc. 36, Exh. 1). They contend that since that date she has incurred charges for "rent, a security deposit, late fees and non-compliance fees." (Doc. 36 at 2). Defendants allege that the balance of these charges was $2,242.92 as of April 19, 2013, as reflected in a letter of that date from counsel for CMHA to counsel for plaintiffs. (*Id*., Exh. 2).

The April 19, 2013 letter alleges that plaintiff Kinkade owed a balance of $2,242.92. The letter states that Kinkade's monthly rental obligation continued throughout the pendency of the litigation and the total rent that accrued was $8,400.00 ($560.00 per month for the period October 2011 through December 2012). In addition, the letter states that prior to October 2011, plaintiff owed $110.00 for September rent; after the date of the settlement, CMHA charged plaintiff $560.00 for both January and February 2013 rent and $35.00 for March 2013 rent; during the litigation, plaintiff accumulated a $100.00 fee for failing to recertify her eligibility for public housing; and plaintiff owed $274.88 for her security deposit, although the time period is not specified. According to the letter, the balance owed of $2,242.92 was calculated as follows: (1) as of the settlement date, plaintiff owed a total of $8,901.88; (2) since the settlement, plaintiff had accrued an additional amount owed of $1,190.00; and (3) $7,832.00 was to be subtracted

5

from the total of these two amounts to account for amounts paid on plaintiff's behalf by CMHA, leaving a balance of $2,242.92.[4] (*Id.*). The letter does not reference late charges.

Defendants argue that the above charges are not covered by the Settlement Agreement and the Settlement Agreement did not release plaintiff Kinkade from liability for paying the charges outlined in the April 19, 2013 letter. They allege that the Settlement Agreement "compromised the parties' claims against each other 'arising out of the lawsuit.'" (Doc. 36 at 2, citing Settlement Agreement, ¶ 3.2). Defendants argue that the obligations set forth in the letter arose out of plaintiff Kinkade's "lease agreement and landlord-tenant relationship with CMHA" and that the Settlement Agreement did not contemplate that those obligations would be compromised. (*Id.* at 2-3, citing Doc. 36, Exh. 1). Defendants contend that any rental obligations intended to be covered by the Settlement Agreement were specifically addressed in the Settlement Agreement as shown by the provisions pertaining to plaintiff Angela Brown. (Doc. 36 at 4-5). Defendants argue that the absence from the Settlement Agreement of similar provisions addressed to plaintiff Kinkade's "rent, security deposits, late fees and non-compliance fees" clearly shows that the parties did not intend to compromise those obligations. (*Id.* at 5).

In reply, plaintiffs assert that defendants' subjective understanding of the release should not be considered in light of the plain language of the release. (Doc. 37). In addition, plaintiff Kinkade indicates that the charges she allegedly owes are related to her relocation from 2329 Harrison Avenue to Claymore Terrace and were imposed in violation of federal law; the charges were the subject of the two state court eviction actions, which CMHA dismissed; and because no eviction action was pending against plaintiff Kinkade at the time the Settlement Agreement was

---

[4] The calculation in the last paragraph of the letter appears to be incorrect as $8,901.88 added to $1,190.00 equals $10,091.88, less $7,832.00 equals $2,259.88.

6

signed and defendants did not make an exception for her in the Settlement Agreement, defendants cannot be heard to argue that they reserved their claims against plaintiff Kinkade.

### III. The motion to enforce the Settlement Agreement should be granted.

#### 1. The Court has jurisdiction to enforce the Settlement Agreement.

As a threshold matter, the Court must address the issue of its jurisdiction over plaintiffs' motion to enforce the Settlement Agreement. "Enforcement of [a] settlement agreement . . ., whether through [an] award of damages or decree of specific performance, is more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Amer.*, 511 U.S. 375, 378 (1994). A district court retains jurisdiction to enforce a settlement agreement if the dismissal entry incorporates the terms of the settlement agreement, or if the order of dismissal includes a separate provision governing the parties' obligation to comply with the terms of the settlement agreement, such as a provision retaining jurisdiction over the settlement agreement. *Id.* at 381. *See also Hill v. Ohio State Univ.*, 870 F. Supp.2d 526, 530 (S.D. Ohio 2012) (citing *Moore v. United States Postal Serv.*, 369 F. App'x 712, 716-17 (6th Cir. 2010) (district court retains jurisdiction over a settlement agreement when the judgment entry dismissing the underlying case provides: "The Court retains jurisdiction over the settlement contract for the purposes of its enforcement.")).

Here, the district court's order dismissing the parties' lawsuit specifically provides as follows: "The Court retains jurisdiction over the settlement agreement for the purposes of its enforcement." (Doc. 34). Accordingly, there is no question that the district court retains jurisdiction over the Settlement Agreement and has authority to resolve the parties' dispute over the release of plaintiff Kinkade's claims.

7

**2. Ohio law of contracts governs interpretation of the Settlement Agreement.**

A settlement agreement is a type of contract, and state substantive law governing contracts generally controls a settlement agreement. *Cogent Solutions Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (citing *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992) (quoting *White Farm Equip. Co. v. Kupcho,* 792 F.2d 526, 529 (5th Cir. 1986)). Here, Ohio contract law must be applied pursuant to ¶ 3.4 of the Settlement Agreement, which states: "This Agreement is made and entered into in the State of Ohio, and shall in all respects be interpreted, enforced and governed under the laws of Ohio and any applicable federal law." (Doc. 35-1, Plaintiff's Exh. A).

The primary role of the court in examining a written instrument is to ascertain and give effect to the intentions of the parties. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority,* 678 N.E.2d 519, 526 (Ohio 1997) (citing *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989)). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Id.* (quoting *Kelly v. Med. Life Ins. Co.,* 509 N.E.2d 411, syll. ¶ 1 (Ohio 1987)). The court must give plain language its ordinary meaning unless "manifest absurdity" results or unless some other meaning is clearly evident from the face of the overall contents of the contract. *Id.* (citing *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, syll. ¶ 2 (Ohio 1978)). A writing or writings which are executed as part of the same transaction will be read as a whole, and the parties' intentions as to each part will be gathered from consideration of the whole. *Id.* (citations omitted).

If the contract language is clear and unambiguous, there are no issues of fact to be determined. *Lincoln Electric Company v. St. Paul Fire and Marine Insurance Company,* 210

F.3d 672, 684 (6th Cir. 2000) (citing *Inland Refuse Transfer Co. v. Browning-Ferris Indus. of Ohio,* 474 N.E.2d 271, 272-73 (Ohio 1984)). The language will be enforced as written. *See Ledyard v. Auto-Owners Mut. Ins. Co.,* 739 N.E.2d 1, 3-4 (Ohio App. 8th Dist. 2000) (citations omitted). The question of whether the language of an agreement is ambiguous is a question of law for the court to decide. *U.S. v. Donovan,* 348 F.3d 509, 512 (6th Cir. 2003).

Under Ohio law, a release is a contract interpreted in accordance with the rules governing contract construction. *Seals v. Gen. Motors Corp.*, 546 F.3d 766, 771 (6th Cir. 2008) (citing *Shifrin v. Forest City Enters., Inc.,* 597 N.E.2d 499, 501 (Ohio 1992); *Task v. Nat'l City Bank,* No. 65617, 1994 WL 43883, at *4 (Ohio App. 8th Dist. Feb. 10, 1994)). In *Seals*, the court interpreted a release the plaintiff granted his employer, which included "all claims, demands and causes of action," "known or unknown," "which [the plaintiff] may have related to [his] employment." *Id*. at 772. Although the release was executed in connection with a job buyout offer, the Court found that the express terms of the release "plainly and unambiguously" included the plaintiff's then existing Ohio law claim for workplace intentional tort seeking damages for injuries sustained in the course of the plaintiff's employment. *Id.*

**3. The parties agreed to release all claims that arose prior to the date of the Settlement Agreement.**

The Court finds as a matter of law that the release provision of the Settlement Agreement is clear and unambiguous as to its scope. The parties agreed to "fully and finally release each other from any and all legal and equitable claims arising out of the Lawsuit as well as up through the date of this Settlement Agreement." (Doc. 35, Plaintiff's Exh. A, ¶ 3.2). Further, defendants "specifically" agreed to release plaintiffs "from all claims, demands, actions and causes of action, obligations, damages, costs or expenses," "known or unknown," "contingent or otherwise," "specifically mentioned or not," that defendants "now have or have had or which

9

might be claimed to exist at or prior to the date of this Agreement." (*Id.*). Thus, defendants clearly released plaintiff Kinkade from any claims, obligations or damages that arose prior to the date of the Settlement Agreement.

In arguing that the release does not cover the particular amounts at issue here - charges for rent, a security deposit, late charges, and non-compliance fees - defendants ignore pertinent language of the Settlement Agreement. Defendants assert that they did not release claims for these amounts because plaintiff Kinkade's obligations to pay such amounts purportedly do not arise out of the parties' lawsuit giving rise to the Settlement Agreement. However, defendants ignore the plain language of the Settlement Agreement by which they explicitly agreed to release "all legal and equitable claims arising out of the Lawsuit *as well as up through the date of this Settlement Agreement.*" (*Id.*). As in *Seals*, 546 F.3d at 771, the broad release provision of the Settlement Agreement plainly and unambiguously includes *all* claims of the parties, whether related to the lawsuit or not, including defendants' claims to rent, security deposits, late charges, non-compliance fees, and all other "claims, demands, actions and causes of action, obligations, damages, costs or expenses" in existence prior to or as of the date of the Settlement Agreement. (Doc. 35, Plaintiff's Exh. A, ¶ 3.2).

The release therefore covers any claims by CMHA for damages and obligations of plaintiff Kinkade that pre-date the Settlement Agreement or which were in existence as of the date the Settlement Agreement was executed. Based on the plain and unambiguous language of the Settlement Agreement, defendants released plaintiff Kinkade from any damages and obligations in existence as of the date of the Settlement Agreement in exchange for Kinkade's mutual release of her claims against defendants and, in essence, wiped the slate clean. Thus, as

10

of December 4, 2012, the date defendants signed the Settlement Agreement, plaintiff Kinkade's account balance with CMHA was $0.00.

**4. Plaintiff Kinkade is entitled to specific performance of the Settlement Agreement.**

In fashioning the appropriate remedy, the Court notes that the relief plaintiff Kinkade seeks is an order requiring defendants to abide by the terms of the Settlement Agreement so as to accurately reflect plaintiff Kinkade's account balance with CMHA and foreclose threatened eviction proceedings against her. In Ohio, equitable relief such as specific performance has been granted where "the legal remedy of damages would not make the aggrieved party whole." *State ex rel. Wright v. Weyandt*, 363 N.E.2d 1387, 1390 (Ohio 1977). *See also Sashti, Inc. v. Glunt Indus., Inc.*, 140 F. Supp.2d 813, 817 (N.D. Ohio 2001) ("[t]he remedy of specific performance is only available when there is no adequate remedy at law, *i.e.*, damages.") (citing *Gleason v. Gleason*, 582 N.E.2d 657, 661 (Ohio App. 4th Dist. 1991)). Specific performance of contracts is a matter that rests in the sound discretion of the Court and is "controlled by principles of equity, on full consideration of the circumstances of each particular case." *Roth v. Habansky*, No. 82027, 2003 WL 22309508, at *3 (Ohio App. 8th Dist., Oct. 9, 2003).

Here, plaintiff Kinkade does not seek damages, nor will damages adequately compensate her for defendants' failure to abide by the terms of the Settlement Agreement. Rather, plaintiff is entitled to defendants' full compliance with the unambiguous terms of the parties' negotiated Settlement Agreement. Accordingly, specific performance of the terms of the Settlement Agreement is the appropriate remedy. In accordance with the terms of the release provision of the Settlement Agreement, defendants should be required to release any claims against plaintiff Kinkade for damages or obligations that predate the Settlement Agreement or which were in existence as of that date.

**IT IS THEREFORE RECOMMENDED THAT:**

Defendants should be ordered to comply with the terms of the Settlement Agreement by: (1) releasing any claims against plaintiff Carla Kinkade for damages or obligations that arose prior to or were in existence as of December 4, 2012; (2) releasing any claims against Carla Kinkade for penalties or payment obligations that have been assessed against her post-settlement for failure to pay amounts purportedly owed as of the date of the Settlement Agreement; (3) modifying Carla Kinkade's CMHA account to reflect these adjustments; and (4) precluding defendants from pursuing eviction proceedings against plaintiff Kinkade based on any damages or penalties that have been assessed against her in violation of the terms of the Settlement Agreement.

Date: 9/30/13

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

MALIAKA DAVIS, et al.,
    Plaintiffs,

Case No. 1:11-cv-533
Bertelsman, J.
Litkovitz, M.J.

vs.

CINCINNATI METROPOLITAN
HOUSING AUTHORITY, INC., et al.,
    Defendants.

# NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).